GEORGE W. DRAPER, III, JUDGE
Timothy S. Pestka and Rudy M. Chavez (hereinafter, “Appellants”) request this Court to determine whether the Missouri Senate (hereinafter, “the senate”) violated article III, section 32 of the Missouri Constitution when it considered, voted upon, and pürported to pass Truly Agreed To and Finally Passed House Bill 150 (hereinafter, “HB 150”) during a veto session convened in September 2015. This- Court holds the .senate lacked authority to vote to override the governor’s veto during the September 2015 veto session because only bills returned by the governor on or after the fifth day before the end of the regular legislative session can be taken up during a September veto session. The circuit court’s judgment is reversed.
Factual and Procedural History
The facts are,.undisputed. On April 21, 2015, the Missouri General Assembly passed HB 150, which made changes to Missouri’s unemployment benefits compensation statutes. The governor vetoed HB 150 on May 5, 2015, more than five days before the General Assembly adjourned sine die. Before adjournment, the Missouri House of Representatives (hereinafter, “the house”) reconsidered HB 150 and voted to override the governor’s veto. On May 15, 2015, the senate adjourned without taking any action to reconsider HB 150 or to override the governor’s veto.
An unrelated bill, which was vetoed after. the General Assembly adjourned, resulted in the General Assembly reconvening for a veto session pursuant to article III, section 32, commencing September 16, 2015. During the veto session, the senate reconsidered HB 150,and voted to override the governor’s veto. On October 16, 2015, most of the changes to the unemployment benefits compensation statutes contemplated by HB 150 went into effect. The, remaining changes went into effect on January 1,2016.
Appellants filed a declaratory judgment action to declare HB 150 unconstitutional and requested the entry of a temporary restraining order, preliminary injunction, and permanent injunction prohibiting HB 150 from being executed or enforced. Appellants claimed the .senate’s veto during the September . 2015 veto session was untimely because it violated the procedure *408 set forth in article III, section 32. The state' filed a motion for judgment on the pleadings, arguing the senate’s vote was timely and did not run afoul of article III, section 32.
The circuit court sustained the state’s motion, finding the senate’s reconsideration of HB 150 during the September 2015 veto session did not violate article III, section 32. The circuit court found article III, section 32 did not limit what bills could be considered during the veto session and there‘ was no requirement that a vetoed bill must be reconsidéred before the end of the regular legislative session. Appellants appeal. This Court has exclusive jurisdiction. Mo. Const, art. V, see.'3.
Standard of Review
When evaluating the circuit court’s judgment sustaining the state’s motion for judgment on the pleadings, this Court reviews the allegations in Appellants’ petition to determine whether the facts pleaded therein are insufficient as a matter of law. State ex rel. Nixon v. Am. Tobacco Co., Inc., 34 S.W.3d 122, 134 (Mo. banc 2000). A circuit court “properly grants a motion for judgment on the pleadings if, from the face of the pleadings, the moving party is entitled to a judgment as a matter of law.” Id. This case presents issues concerning legislative power and interpretation of constitutional provisions. “Constitutional challenges are issues of law this Court reviews de novo.” Estate of Overbey v. Chad Franklin Nat'l Auto Sales North LLC, 361 S.W.3d 364, 372 (Mo. banc 2012).
Constitutional Validity of HB 150
Appellants argue the circuit court erred in finding HB 150 enforceable and constitutionally enacted over the governor’s veto because the senate was without authority to consider HB 150 during the September 2015 veto session. Appellants contend article III, section 32 reserves consideration of only those bills vetoed within five days of, or after, the regular legislative session’s adjournment (hereinafter, “late vetoed bills”) during a September veto session. Hence, because HB 150 was vetoed prior to the last five days of the regular legislative session, Appellants argue the senate had to vote to override the governor’s veto prior to the end of the regular legislative session for the veto to be valid. The state argues the senate acted well within its plenary power, and HB 150 was enacted validly because article III, section 32 contains no language that limits or prohibits the senate from taking this action.
“The legislature represents the plenary power of the people in our three-partite system and may do everything the people have not denied it the power to do in the constitution.” Thompson v. Comm, on Legislative Research, 932 S.W.2d 392, 394 (Mo. banc 1996) (superceded by statute as recognized in Brown v. Carnahan, 370 S.W.3d 637, 648 (Mo. banc 2012)). Stated differently, the legislature has plenary power to enact legislation on any subject in the absence -of a constitutional prohibition. Brooks v. State, 128 S.W.3d 844, 847 (Mo. banc 2004).
The parties do not dispute the legislature’s plenary power to reconsider bills returned by the governor and its power to vote to override a gubernatorial veto. Rather, the parties dispute whether the senate had the power to override the governor’s veto during the September 2015 veto session when the house voted to override the veto during the regular legislative session. This case presents an issue of first impression.for this Court.

Historical Examination of Article III, section 32

“Constitutional provisions are subject to the same rules of construction *409 as other laws, except that constitutional provisions are given a broader construction due to their more permanent character.” Neske v. City of St. Louis, 218 S.W.3d 417, 421 (Mo. banc 2007) (overruled, on other grounds by King-Willmann v. Webster Groves Sch. Disk, 361 S.W.3d 414 (Mo. banc 2012)). “In construing individual sections, the constitution must be read as a whole, considering other sections that may-shed light on the provision in question.” State ex rel. Mathewson v. Bd, of Election Comm’rs of St. Louis Cnty., 841 S.W.2d 633, 635 (Mo. banc 1992). “This Court must assume that every word contained - in a constitutional provision has effect, meaning, and is not mere surplusage.” State v. Honeycutt, 421 S.W.3d 410, 415 (Mo. banc 2013). “Words used in constitutional provisions are interpreted to give effect to their plain, ordinary, and natural meaning.” Wright-Jones v. Nasheed, 368 S.W.3d 157, 159 (Mo. banc 2012).
“Challenges to legislation based on constitutionally imposed procedural limitations are not favored.” Mo. Roundtable for Life, Inc. v. State, 396 S.W.3d 348, 351 (Mo. banc 2013). However, if the act “clearly and undoubtedly violates the constitutional limitation,” this Court will hold it unconstitutional. Id. (quoting Hammerschmidt v. Boone County, 877 S.W.2d-98, 102 (Mo. banc 1994)).' “A constitutional provision should never be construed to work confusion and mischief unless no other reasonable construction is possible.”’ Am. Fed’n of Teachers v. Ledbetter, 387 S.W.3d 360, 363-64 (Mo. banc 2012) (quoting Theodora v. Dep’t of Liquor Control, 527 S.W.2d 350, 353 (Mo. banc 1975)).
“One of the accepted canons of statutory construction permits and often requires an examination of the historical development of the legislation, including changes therein and related statutes.” State ex rel. Smith v. Atterbury, 364 Mo.
963, 270 S;W.2d 399, 405 (Mo. banc 1954). The legislative history of Article III, section 32 is instructive in resolving the issue presented here. Article III, section 32, as adopted in the Missouri Constitution of 1945, provided:
Every bill presented to the governor . and returned with his objections shall stand as reconsidered in the house to. which it is returned. The objections of the governor shall be entered upon the journal, and the house shall proceed at its convenience to consider the question pending, which shall be in this form: ', ‘Shall the Ml pass, the objections of the governor thereto notwithstanding?’ The vote upon this question shall be taken by yeas and nays and if two-thirds of the elected members of the house vote in the affirmative the presiding officer of that house shall certify that fact on the roll, attesting the same by his signature, and send the bill with the objections of the governor to the other house, in which like proceedings shall be had in ‘ relation thereto. The bill thus certified shall be deposited in, the office of the secretary of state as an áuthentic act and shall become a law.
When the 1945 constitution was adopted, any bill vetoed-by the governor at any time could be reconsidered by the legislature at its convenience. Hence, the legislature was not restricted temporally in how it could proceed regarding any bill vetoed by the governor.-
After the general election in November 1970, Missouri citizens voted to amend article III, section 32- to enact different veto procedures depending on when the bill was vetoed and the year in which the governor’s veto, occurred. The amended language stated in pertinent part:
If the governor returns any bill with his objections after the adjournment of the *410 general assembly .in odd-numbered years, the bill shall be placed at the top of the calendar of the house to which it is returned for consideration when the general assembly reconvenes the following year. If the governor returns any bill with his objection after the adjournment sine die of the general assembly on the ninétieth calendar day after its convening in even-numbered years, the general assembly shall automatically reconvene on the first Wednesday following the first Monday in September of such even-numbered year for a period not to exceed ten calendar days for the sole purpose of considering bills returned by the governor.
Art. Ill, sec. 32 (1970). Thus, bills that were vetoed after adjournment in odd-numbered years would be placed upon the calendar of the house from which it was returned to be considered when the General Assembly reconvened the following calendar year. Bills that were vetoed after adjournment . in even-numbered - years prompted a subsequent September veto session. Notably, this amendment stripped the legislature of its power to reconsider-bills at its convenience. This article retained the procedure for voting to override the governor’s veto and the requirement that, after an initial vote, the bill must be sent to the other house for “like proceedings” to occur.
Two' years later, at the Í972 general election, the people of Missouri again voted to amend article III, section 32 to change the procedure for the legislature to reconsider bills vetoed by the governor. The amendment provided:
If the governor returns any bill with his objections on or after the fifth day before the last day upon which a session of the general assembly may consider bills in odd-numbered years, the bill shall be placed at the top of the calendar of the house to which it is returned for consid- ■ eration when the general assembly reconvenes the following year. If the governor returns any bill with his objections on or after the fifth day before the last day upon which a session of the general assembly may consider bills in even-numbered years, the general assembly shall automatically reconvene on the first Wednesday following the first Monday in September of- such even-numbered year for a period not to exceed ten calendar days for the sole purpose of considering bills returned by the governor.
Art. Ill, sec. 32 (1972). This amendment retained the odd-even-numbered year distinction for reconsideration of bills vetoed by the governor. However, the amendment expanded the window for reconsideration to include not only bills vetoed after adjournment but also bills vetoed on or after the fifth day before the end of the regular legislative session. Again, this article retained the procedure for voting to override the veto and the requirement that, after an initial vote, the bill must be sent to the other house for “like proceedings” to occur.
Finally, article III, section 32 was amended after a general election in 1988. This version governs Appellants’ claim and provides in full:
Every bill presented to the governor and returned with his objections shall stand as reconsidered in the house to which it is returned. If the governor returns any bill with his objections on ox-after the fifth day before the last day upon which a session of the general assembly may consider bills, the general assembly shall automatically reconvene on the fii-st Wednesday following the second Monday in September for a period not to exceed ten calendar days for the sole purpose of considering bills re-
*411 turned by the governor. The objections of the governor shall be entered upon the journal and the house shall proceed to consider the question pending, which shall be in this form: ‘Shall the bill pass, the objections of the governor thereto notwithstanding?’ The vote upon this question shall be taken by yeas and nays and if two-thirds of the elected members of the house vote in the affirmative the presiding officer of that house shall certify that fact on the roll, attesting the same by his signature, and send the bill with the objections of the governor to the other house, in which like proceedings shall be had in relation thereto. The bill thus certified shall be deposited in the office of the secretary of state as an authentic act and shall become a law.
Art. Ill, sec. 32 (1988). The most significant changes of the amendment, resulting in the current version of article III, section 32, were the elimination of the odd-even-numbered year distinction and the automatic convening of a September veto session each year after the governor vetoes bills on or after the fifth day before the last day of the regular legislative session.

HB 150 is Unconstitutional

Article III, section 32 has been amended multiple times since 1945. “The fundamental rule of constitutional construction is that courts must give effect to the intent of the people in adopting the amendment.” Barnes v. Bailey, 706 S.W.2d 25, 28 (Mo. banc 1986). Amendments are presumed to have intended to effect some change in the existing law. State ex rel. Registration for the Healing Arts v. Southworth, 704 S.W.2d 219, 224-25 (Mo. banc 1986). This is because “[t]o amend a [provision] and accomplish nothing from the amendment would be a meaningless act.” State v. Liberty, 370 S.W.3d 537, 561 (Mo. banc 2012). “[P]rovisions retained are regarded as a continuation of the former law, while those omitted are treated as repealed.” Jefferson ex rel. Jefferson v. Mo. Baptist Med, Ctr„ 447 S.W.3d 701, 708-09 (Mo.App.E.D.2014) (quoting State ex rel. Klein v. Hughes, 351 Mo. 651, 173 S.W.2d 877, 880 (1943)).
The plain language of article III, section 32 demonstrates that a veto session is not triggered unless and until a bill is returned by the governor on or after the fifth day before the end of the regular legislative session. Thus, it is uncertain whether a veto session will actually take place unless and until the governor returns a bill on or after the fifth day before the end of the regular legislative session. Moreover, reconsideration contemplates a two-house process, wherein the house to which the bill is returned must vote to override the governor’s veto and then send the bill to the other house for “like proceedings.”
Here, the resolution of whether the senate could reconsider HB 150 after adjournment of the regular legislative session depends upon the purpose of the September veto session. Article III, section 32 provides that only if the governor returns any bill with his objections on or after the fifth day before the end of the regular legislative session, then shall the September veto session be convened. That session will be convened “for the sole purpose of considering bills returned by the governor.” The parties disagree about the meaning and scope of this phrase. Appellants argue the veto session can only address late-vetoed bills when reading the first two sentences of article III, section 32 together. The state argues that because article III, section 32 refers to “bills”— plural — the legislature is not limited to reconsidering only late-vetoed bills. The state maintains the legislature can consider any vetoed bill, regardless of when the veto occurred during that particular term of the General Assembly.
*412 A close reading of the amendments to article III, section 32 since 1945 reveals clearly the people’s intent to confine a September veto session to only late-vetoed bills. In 1945, the legislature could reconsider any bill vetoed by the" governor, regardless ,of when the governor vetoed the bill, at its convenience. As the dissenting opinion concedes, this original section “made no mention of late-vetoed, bills and did not prescribe a special procedure in the event that the governor returned a bill with objections after adjournment of the legislature.” Op. at ⅛15. Since then, in every- subsequent amendment to article III, section 32, however, the people of Missouri gradually have restricted the legislature’s power regarding which bills it can reconsider and when the reconsideration can occur. The subsequent amendments enacted by the people of Missouri have made a clear distinction between “every bill” returned by the governor and late-vetoed bills. This Court must presume these amendments have meaning and were intended to define the scope of the September veto session.
All of the subsequent amendments to article III, section 32 were enacted to protect the General Assembly’s right to override the governor on late vetoed bills. When á bill is vetoed more than five days before the end of the regular legislative session, the General Assembly has adequate time to reconsider a vetoed bill or reintroduce the same or similar bill for consideration and adoption. Late-vetoed bills put the legislature at a disadvantage when the governor returns a bill at or near adjournment because there is little, if any, time to reconsider the veto after adjournment.[1] Hence, when construing the first two sentences of article III, section 32 together, • this Court finds that the veto session’s purpose is to consider those bills — plural—that brought the session into existence, namely late-vetoed bills.[2]
If the veto session’s scope is not confined to late-vetoed bills, as urged by the state and the dissenting opinion, then the legislature could ostensibly address any vetoed bills during the General Assembly’s entire session or during the governor’s term in office, which could span several years. Not only does this construction render the limitation of “on or after the fifth day” before the end of the regular legislative session meaningless, it also leads to an absurd result. See Humane Soc’y of U.S., v. State, 405 S.W.3d 532, 537 (Mo. banc 2013) (finding that a constitutional interpretation producing an absurd result is unreasonable).
The absurdity is further demonstrated by the dissenting opinion’s reliance on the language that all vetoed bills must be reconsidered by “the house to which it is returned” as providing an “implicit temporal limitation on the reconsideration of vetoed bills due to the manner in which the houses 'of the General Assembly are formed.” Op. at ⅛17. Not only does the dissenting opinion read a limitation into the text that is not stated, the dissenting *413 opinion presumes that every election cycle •will result in future houses of the General Assembly being . composed of different members. The dissenting opinion posits that a future General Assembly could not validly override the veto to a bill originally passed by the houses of a previous General Assembly. However, the dissenting opinion makes no room for the.possibility, albeit unlikely, that each member seeking election retains his or her seat in the General Assembly. Thus, and in that instance, there is no implicit temporal limitation that would preclude the next session of the General Assembly, comprised of identical members', from taking up unfinished business from the previous session under the dissenting opinion’s interpretation of article III, section 32.'While this example is somewhat implausible, the dissénting opinion also raises the specter of reconsideration of vetoed bills left unaddressed during the first session of the General Assembly and held out until the second session begins. The dissenting opinion recognizes that previous versions of article III, section 32 explicitly contemplated such carry over; however, it is clear that the current version of article III, section 32 does not provide such a power. The dissenting opinion’s rationale is ultra vires.
It should be noted that neither the parties nor the dissenting opinion can point to any single, prior instance in which the legislature had endeavored to override the governor’s veto in such a way as occurred here, despite both arguing article III, section 32 provides the legislature such clear-cut plenary power. Were this Court to adopt the dissenting opinion’s interpretation, it would encourage the legislature to engage in gamesmanship,'delay, and dilatory conduct that would harm the people of Missouri by failing to enact legislation in a timely manner, Of note, the people of Missouri who would be harmed are those true Missourians who amended the constitution in 1945, 1970, 1972, ■ and . 1988 to structure and assist the legislature in reconsideration of vetoed bills. The people of Missouri are entitled to' the efficient, orderly conduct of legislative business during the General Assembly’s -session.
There is no dispute that HB 150 was not a late-vetoed bill. The house sent HB 150 to the senate for reconsideration two days before the. end of the regular legislative session. The senate’s failure to act on HB 150 before the end of the regular legislative session resulted in HB 150 being tabled pursuant to article III, section 20(a), Accordingly, the senate lacked authority to reconsider HB 150 during the September 2015 veto session.[3] The senate’s override of the governor’s veto of HB 150 was untimely, causing HB 150 not to be passed “the objections of the governor thereto notwithstanding.” Because HB 150 was not passed over the governor’s veto, none of its provisions became law.
Conclusion
' The circuit court’s judgment is reversed.
Stith, Wilson and Teitelman, JJ., concur; Russell, J., clissents in separate opinion filed; Breckenridge, C.J., and Fischer, J., concur in opinion, of Russell, J.

. The dissenting opinion questions why the objective of the September veto session could not include reconsideration of bills that were not vetoed late. This interpretation renders the phrase "on or after the fifth day” superfluous, which is contrary to this Court's requirement that it must give meaning to every word and assume that any constitutional amendment was intended fo effect a change in the law.

. The likelihood that the governor could veto multiple bills on or after the fifth day. before the end of the legislative session, thereby, resulting in reconsideration of multiple bills — ■ plural — belies the dissenting opinion’s alleged confusion as to why[1] the legislature would require a ten-day veto session to reconsider late-vetoed bills.

. . Because this Court holds that only late-vetoed bills can be reconsidered during a September veto session, this Court need not address the issues of whether the senate had authority to act alone during the September 2015 veto session and whether the regular legislative session and the September 2015 session are considered "like proceedings” as contemplated by article III, section 32.